Filed 3/11/14  P. v. Avalos CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | G049101 |
|       v. | (Super. Ct. No. SWF024768) |
| SAUL VILLA AVALOS, | O P I N I O N |
|     Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge, and Larrie R. Brainard, Judge (retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. IV, § 6 of the Cal. Const.). Affirmed in part as modified and reversed in part.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

\*       \*       \*

An information charged Saul Villa Avalos with five counts: (1) first degree murder with premeditation and deliberation (Pen. Code, § 187, subd. (a) [count 1]); (2) possession of marijuana for sale (Health & Saf. Code, § 11359 [count 2]); (3) unlawful possession of an assault weapon (former Pen. Code, § 12280, subd. (b) [count 3]); (4) selling, furnishing, administering, transporting, or giving away more than 28.5 grams of marijuana (Health & Saf. Code, § 11360, subd. (a) [count 4]); and (5) unlawfully carrying a loaded firearm (former Pen. Code, § 12031, subd. (a)(1) [count 5]).

Three jury trials were conducted. In the first trial, a jury convicted Avalos on counts 2 through 5, but was unable to reach a verdict on count 1 (first degree murder). In the second trial, a jury was again unable to reach a verdict on count 1. In the third trial, a jury found Avalos guilty of first degree murder as charged in count 1 and found true the allegation he personally and intentionally discharged a firearm proximately causing death or great bodily injury to another person who was not an accomplice (Pen. Code, §§ 12022.53, subd. (d), 1192.7, subd. (c)(8)). The trial court sentenced Avalos to a total prison sentence of 50 years to life.

In this appeal, Avalos challenges the conviction on count 1, rendered in the third trial, and the conviction on count 4, rendered in the first trial. He makes two arguments. First, he argues the trial court in the third trial erred by allowing the prosecutor to present evidence of the facts underlying his convictions in the first trial, as well as evidence relating to police searches, marijuana growing, and the drug trafficking culture. Second, he argues the court in the first trial erred by denying his motion for acquittal on count 4 because there was insufficient evidence that he transported the marijuana found in his truck.

Although Avalos's trial counsel did not preserve objections to the challenged evidence in the third trial, we conclude there was no ineffective assistance of

counsel because Avalos suffered no prejudice from the admission of the evidence. We therefore affirm the conviction on count 1. We also conclude the trial court erred by denying Avalos's motion for acquittal on count 4, and therefore reverse the conviction on that count and direct the trial court to modify the judgment by vacating the concurrent three-year sentence under that count.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

## I.

## The Killing

On February 23, 2008, Charles Richardson was shot twice, once in the chest, and once in the right thigh, in front of his truck and trailer repair business in Romoland, Riverside County. He later died of blood loss from those wounds.

Everardo Alcazar, who was working on a house in the area, saw some of the shooting from about 200 yards away. After hearing a gunshot, Alcazar looked toward Richardson's repair shop and saw a Hispanic man, who was wearing dark clothing, standing close to Richardson. Alcazar heard another shot, and saw Richardson grab his belly and "go down." The man who shot Richardson was laughing.

A black car and a white car were parked across the street from the place where Richardson was shot. A man wearing light-colored clothing was standing next to the black car; another man was standing outside the white car. The man who shot Richardson got into the driver's seat of the black car, and the man in the light-colored clothing got into the passenger side. The man standing outside the white car got inside it, and both cars drove off.

Elizabeth Alvarado saw Richardson lying on the ground as she drove past him. She stopped, got out of her car, and asked him what had happened. He said

3

somebody had shot him and pleaded with her, "please don't let me die." His cell phone was covered in blood. Richardson told Alvarado he had been shot by a man who arrived in a black car.

Riverside County Sheriff's Deputy Leeondre Radford was the first responding law enforcement officer at the scene. When Radford asked Richardson who shot him, Richardson replied, "Javier." Richardson said Javier was a short "Mexican" with a thin build and a goatee, two other men were with him, and they had arrived in a black Volkswagen Jetta. Richardson told Radford the shooting was "over money."

## II.

### Police Interviews

Avalos, his brother, Javier Villa Avalos,[1] and his cousin, Samuel Perez, were apprehended on February 24, 2008, the day after Richardson was killed, after they had been seen driving away from a residence on Shadybend Drive in Moreno Valley. Avalos's black Chevrolet Blazer was found parked in the garage.

Riverside County Sheriff's Investigator Edwin Baeza interviewed Avalos on February 24 or 25, 2008.[2] The interview was audio-recorded and a transcript of the recording was received in evidence as trial exhibit 1. Avalos initially denied any involvement in the murder. He claimed that from 1:00 p.m. to about 3:30 p.m. on February 23, he had been at a friend's house across the street from Richardson's trailer repair business and that "[n]othing happened" while he was there. Avalos claimed he was at his girlfriend's house from 3:30 p.m. until his apprehension the next day.

Later in the interview, Baeza again asked Avalos whether anything happened while he was at the friend's house across the street from Richardson's trailer repair business. This time, Avalos replied, "[w]ell, not at 1:00" and told Baeza, "[t]hey

---

[1] To avoid confusion, we refer to Javier Villa Avalos as Javier.

[2] Baeza testified the interview was conducted on February 24, while the transcript has an interview date of February 25.

4

shot a man." Avalos denied being the shooter. When Baeza asked who shot the man, Avalos replied, "I didn't see." Baeza told Avalos there were cameras in the area where the man was shot and law enforcement officers and witnesses had been interviewed. Avalos then said, "I did see" and "it's a very long story." He related that Javier was angry at Richardson because Richardson owed Javier money, that Richardson became angry with Javier for trying to collect, and that Richardson tried to hit Javier. When Baeza asked whether he would find someone to say that Javier did not shoot Richardson, Avalos did not respond.

Avalos told Baeza that Javier did not have the gun and claimed that another man, whose nickname was "Flaco," had been present when Richardson was shot. When asked who had shot Richardson, Avalos said he did not do it, Javier did not do it, and Perez did not do it. Avalos claimed that he and Flaco looked alike and were wearing similar black-and-blue clothing at the time Richardson was shot.

After the interview, Avalos and Perez were placed together in the same room. Their conversation was audio-recorded and a transcript of the recording was received in evidence as trial exhibit 5. At one point, Avalos said, "[t]hey know it's me, so I'm fucked" and "[w]hen the[y] find out it was me, they're going to fuck . . . me up quick dude" (boldface & italics omitted). Perez asked Avalos how many times he shot Richardson. When Avalos said he did not know, Perez told him, "you shot him three times, and they say it's five per shot, I think." Avalos told Perez, "[y]ou need to get me a lawyer so I can claim self defense, so we can tell them that [Richardson] . . . attacked Javie[r]."

Avalos told Perez, "I had to lie to them and told them that it was a guy El Flaco, that guy I don't know" and "[t]he fucking story that I wasn't the one who did it isn't going to fly." Avalos later said: "It[']s the worse mistake I have made in my life. Well if you get caught. If you don[']t get caught, you don[']t give a shit. But when they catch you, you think that it's the worst one of your life" (boldface & italics omitted).

5

Avalos was interviewed again. During this interview, Avalos stated he shot Richardson. Avalos claimed he did not mean to shoot Richardson but did it to protect his brother. Avalos said he placed the gun in a concealed compartment in the center console of his Blazer and explained how to obtain access to the compartment. The murder weapon subsequently was found in the center console of the Blazer, precisely where Avalos said it would be. Also found in the Blazer were a live round of ammunition of the type used in the murder, a live round of .223-caliber ammunition, and about 24 pounds of marijuana.

## III.

### Avalos's Testimony

Avalos testified in his own defense. In February 2008, Avalos was living with his girlfriend and her family in Lake Elsinore. He had lived with Javier and Perez in a residence on Y Avenue, but had moved into his girlfriend's home in late December 2007 or early January 2008.[3]

Avalos testified he knew Richardson as "Charlie," knew he did vehicle body repair work, and often ate lunch with him. When Javier needed body work done on his truck, Avalos had him talk to Richardson. Javier paid Richardson $800 or $900 and later left his truck with Richardson. At some later time, before the work on the truck was completed, Javier took back his truck and asked for a refund from Richardson. Avalos accompanied Javier on at least three occasions in which Javier sought a refund from Richardson. On each occasion, Richardson refused to give Javier a refund, and, on each occasion, Javier was upset.

On February 23, 2008, Avalos worked in the morning and had lunch at the home of a friend who lived across the street from Richardson's business. Between 1:00 p.m. and 2:00 p.m., Avalos telephoned Javier to tell him that Richardson was at his

---

[3] The girlfriend, Anna Karen Padilla, testified Avalos was living with her at the time of the murder.

place of business and that Javier should go and ask for his money back. At a little past 3:00 p.m., Javier arrived in a black Volkswagen Golf at Richardson's place of business. He was with a friend known to Avalos only as "Flaco."

From the driveway of his friend's house, Avalos watched Javier get out of his car and walk into Richardson's business, and heard Javier and Richardson arguing. As Avalos walked toward Richardson's, he saw Javier and Richardson on the sidewalk "grabbing" each other. When Avalos was in front of Javier's parked Volkswagen, he heard shots fired by Javier, who quickly got into his car and drove off. Richardson walked back into his business. Scared and in shock, Avalos drove off in his Blazer and followed Javier back to their home.

Perez arrived in his black Chevrolet just as the shooting occurred. Perez did not get out of his car before leaving.

Later, in the evening, Avalos met with Javier and Perez to talk about the shooting. They discussed having Avalos take the blame, and Javier, who earned money selling marijuana, offered to pay for an attorney. Javier placed the murder weapon in the center console of Avalos's Chevrolet Blazer.

During the first police interview, Avalos did not admit to the shooting because he was not sure whether he wanted to take the blame or not. When he was in the interrogation room with Perez, he decided to admit to the shooting. Knowing the conversation with Perez was being recorded, Avalos said things to implicate himself as the shooter. During the second interview, when Avalos confessed to the shooting, he was lying to protect Javier.

## IV.

### Rebuttal Testimony

During the second police interview, and throughout his trial testimony, Avalos referred to Richardson as "Charlie." Avalos testified he had frequent contact with Richardson, who introduced himself as Charlie when they first met. In rebuttal,

7

Richardson's widow testified that Richardson, whose first name was Charles, went by the name "Bill," and would not have been called "Charlie" by a friend or an acquaintance.

DISCUSSION

## I.

## Avalos Suffered No Prejudice from the Admission of Evidence of the Convictions in the First Trial and of the Facts Underlying those Convictions.

### A.

### *Background*

1. *Trial Court Rulings*

In the first trial, the jury convicted Avalos of counts 2 through 5, but failed to reach a verdict on count 1. In the second trial, the prosecutor was permitted to impeach Avalos with the felony convictions in the first trial. The prosecutor acknowledged he could adduce only "the nature of the charge, and the date, and the fact that it's a felony."

At the start of the third trial, the prosecutor requested permission to use the facts underlying the convictions in the first trial. The prosecution's trial brief argued: "[Avalos] should not gain an unjust benefit as a result of being convicted of these crimes in a prior proceeding by claiming that the facts that support his involvement in moral[] turpitude conduct are now irrelevant. In both previous instances, [Avalos] has attempted to portray himself as a crime free, diligent welder, expectant father, and a loving older brother who fell on the sword and admitted responsibility for murder he did not commit. In both instances, [Avalos] has attempted to paint 'Javier' as a hot tempered drug dealer who not only committed the murder but also helped convince his own brother to take the fall for him. Obviously, [Avalos's] credibility is a core issue in this case and whether he was involved in a large scale drug operation along with 'Javier' and 'Samuel' goes to the heart of his credibility."

In defense motion in limine No. 2, Avalos moved to exclude "the felony convictions" under Evidence Code section 352. He argued: "In the present matter defendant objects to the admission of his prior conviction(s) for impeachment purposes because it permits the defendant's credibility to be attacked when he has engaged in no new conduct that affects his credibility."

When the trial court heard the motion in limine, the prosecutor argued: "Avalos during his testimony has portrayed himself in a certain light, and that portrayal is inconsistent with the facts in this case. And I believe the facts in this case strongly indicate that he was involved in moral turpitude conduct and then in previous hearings he lied about his involvement in that conduct." The prosecutor stated he did not intend to cross-examine Avalos with evidence of the fact of the prior convictions. In response, Avalos's counsel objected that evidence of the facts underlying the convictions was irrelevant because "those issues regarding possession of marijuana and the guns are issues that have already been resolved by a prior jury."

In overruling Avalos's objection, the trial court stated: "I'm not sure that legally [the prosecutor] couldn't simply use the fact of the convictions because it's the timing of the testimony that is relevant as to impeachment. But he has chosen not to feeling that would get into complications with the jury perhaps as to prior trials and prior convictions and wishes simply to use the conduct. I will allow him to do so."

2. *Prior Convictions Evidence: Prosecution's Case-in-chief*

During the prosecution's case-in-chief, several law enforcement witnesses testified about items found during searches. Riverside County Sheriff's Investigator Brett Seckinger participated in a search of the residence on Y Avenue where Avalos had lived with Javier and Perez. In one bedroom, Seckinger found a pistol grip and a .380-caliber Winchester cartridge. In the same bedroom, Seckinger also found about one pound of marijuana and receipts with the names, Samuel Perez, Samuel Avalos Perez, Javier, or Juan Hernandez Lopez, on them, and found no items bearing Avalos's name. In

9

a second bedroom, Seckinger found documents and other papers bearing Avalos's name, but found no evidence of the crime.  In a third bedroom, Seckinger found a rifle stock, receipts, and phone numbers.

Riverside County Sheriff's Investigator Glenn Johnson testified he participated in a search of a residence on Shadybend Drive in Moreno Valley.  Avalos, Javier, and Perez had been apprehended after leaving that residence in a black truck.  At that residence, Johnson found a black pistol (not the murder weapon) hidden in a vent, and Riverside County Sheriff's Investigator James Peters found marijuana, a box of ammunition for a nine-millimeter handgun, and crystal methamphetamine.  Peters searched Avalos's Chevrolet Blazer and found the murder weapon, ammunition, and about 24 pounds of marijuana.

Evidence also was presented of marijuana growing and the drug trafficking culture.  Riverside County Sheriff's Senior Deputy Ryan Bodmer testified in detail about the operation of large-scale marijuana "grows," stating they often are operated through Mexican nationals.  He testified that 24 pounds of marijuana would be worth between $12,000 and $125,000.  He testified about patron saints associated with drug trafficking, and testified that, when arrested, Avalos was wearing jewelry portraying the patron saint of drug trafficking and had a tattoo of a marijuana leaf on his arm.

3. *Prior Crimes Evidence:  Cross-examination of Avalos*

During the defense case, Avalos denied any involvement in the drug trade and testified Javier and Perez were drug dealers.  Avalos testified that he told Perez and Javier not to put the 24 pounds of marijuana in the Chevrolet Blazer, but they told him to shut up and did so anyway.  Avalos denied removing marijuana, clothing, or weapons from the residence on Y Avenue.  Avalos believed Javier and Perez would use their earnings from drug dealing to hire a lawyer for him.

On cross-examination, Avalos again denied being a drug dealer, denied living in the residence on Y Avenue at the time of the murder, and insisted the gun and

10

marijuana found in his Chevrolet Blazer were put there by Javier and Perez. The prosecutor impeached this testimony by questioning Avalos about his marijuana leaf tattoo and rings portraying the patron "saint" of drug traffickers. Avalos claimed he got the marijuana tattoo because it was "pretty" and the rings were purchased by Javier and Perez. After Avalos denied ever lying in a prior proceeding, the prosecutor impeached him by showing that, while Avalos had in the first trial denied ever possessing the assault rifle that was the subject of count 3, there was a photograph of him holding that rifle.

B.

*Legal Standards/Forfeiture*

A trial court has broad discretion to admit or exclude evidence of the defendant's prior convictions for impeachment purposes. (*People v. Hinton* (2006) 37 Cal.4th 839, 887.) A conviction may be used for impeachment even if an appeal is pending (*People v. Braun* (1939) 14 Cal.2d 1, 6) or sentence has not been pronounced (*People v. Martinez* (1998) 62 Cal.App.4th 1454, 1459-1463). Evidence of prior convictions offered for impeachment is limited to "the name or type of crime and the date and place of conviction." (*People v. Allen* (1986) 42 Cal.3d 1222, 1270.)

Avalos concedes the convictions in the first trial were prior convictions that could be used to impeach his credibility as a witness. He argues, however, evidence of the prior convictions was only admissible to impeach his credibility, and evidence of the facts underlying the prior convictions, evidence of the police searches, and evidence of marijuana growing and the drug trafficking culture, were inadmissible at any point during trial.

As the Attorney General argues, Avalos failed to pose objections to the challenged evidence admitted during the prosecution's case-in-chief. Avalos argues he preserved his objection with his motion in limine No. 2, by which he objected to the "admission of evidence or testimony regarding his prior felony convictions."

11

Avalos's motion in limine No. 2 did not preserve the objections to the challenged evidence. That motion was narrowly focused and sought exclusion of the evidence only under Evidence Code section 352. In addition, "when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal." (*People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.)[4] Because Avalos's trial counsel did not make objections when the evidence was offered, they have been forfeited.

## C.

### *No Ineffective Assistance of Counsel*

Avalos alternatively argues his trial counsel was ineffective for not making the appropriate objections to the challenged evidence. To prevail on a claim of ineffective assistance of counsel, the defendant must prove (1) the attorney's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards; and (2) the attorney's deficient representation subjected the defendant to prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Cain* (1995) 10 Cal.4th 1, 28.) Prejudice means a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, at p. 694.)

We do not address whether counsel's representation was deficient because we conclude Avalos suffered no prejudice. (*Strickland*, *supra*, 466 U.S. at p. 697 ["a

---

[4] A motion in limine to exclude evidence will preserve an objection for appeal, notwithstanding a failure to object when the evidence is offered, if "(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*People v. Morris* (1991) 53 Cal.3d 152, 190.) These criteria were not satisfied in this case.

court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)  The prosecutor's use of the fact of the prior convictions to impeach Avalos during his testimony was permissible under Evidence Code section 788.  We conclude that admission of evidence of the facts underlying the prior convictions, evidence of the police searches, and evidence of marijuana growing and the drug trafficking culture, was not prejudicial.

Errors in the admission of prior convictions evidence are reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Anderson* (1987) 43 Cal.3d 1104, 1137.)  Under the *Watson* standard, "[t]he reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

Evidence regarding the search of the residence on Y Avenue was generally favorable to Avalos.  No evidence was found in the room in which Avalos had lived.  Marijuana and other evidence were found in the rooms used respectively by Javier and Perez.  The evidence of the search of the Y Avenue address thus corroborated the defense claim that Javier and Perez, not Avalos, were drug dealers and that Javier and Perez placed the marijuana in Avalos's Chevrolet Blazer.  The pistol found during the search of the residence on Shadybend Drive was not the murder weapon.

The evidence of the prior convictions would have come out during cross-examination of Avalos.  He testified, in essence, that he was a responsible, loving father and brother who, unlike Javier, was not a drug dealer, and who was at least initially willing to take the blame for murdering Richardson.  The prosecutor could have impeached that testimony with the prior convictions on counts 2 through 5, and evidence that Avalos had a marijuana leaf tattoo and wore a ring bearing the image of a "patron saint" of drug traffickers.  Avalos testified he had never lied in a prior proceeding.  The

13

prosecutor could, and did, impeach that testimony with evidence showing Avalos lied when he testified in the first trial that he never possessed the assault rifle that was the subject of count 3.

Avalos argues the admission of the prior convictions evidence during the prosecution's case-in-chief in effect forced him to take the stand. It is certain that Avalos would have testified in the third trial even if the evidence of the facts underlying the prior convictions had not been received during the prosecution's case-in-chief. Avalos testified in the first two trials. In his motion in limine No. 2, he stated he intended to testify in the third trial.

The evidence of guilt was very strong. During the recorded conversation between Avalos and Perez, Avalos admitted he killed Richardson and admitted he lied to the investigators by telling them "Flaco" was the shooter. Avalos referred to shooting Richardson as "the worse mistake I have made in my life." (Italics omitted.) During the second police interview, Avalos confessed to shooting Richardson. Avalos said he placed the murder weapon in a concealed compartment in the center console of his Chevrolet Blazer and explained how to gain access to that compartment. The murder weapon was found in Avalos's Chevrolet Blazer in the precise spot at which Avalos said he had placed it. Also found in the Chevrolet Blazer was a live round of ammunition of the type used in the murder.

There is no question that Avalos was at the murder scene. He claimed he was a bystander. Alcazar testified, however, the man standing near Richardson at the time of the shooting was wearing dark clothing. Avalos told investigators that the man who shot Richardson was Flaco, who looked like Avalos and was wearing the same clothing as Avalos at the time of the shooting. Avalos said Flaco was wearing black-and-blue clothing.

Avalos argues the inability of the first two juries to reach a verdict on the murder count demonstrates that admission of the prior convictions evidence in the third

14

trial was prejudicial. A hung jury in a trial can be persuasive in deciding whether error that occurred on retrial was prejudicial. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 520.) In this case, however, the hung juries in the first two trials are persuasive that any error in the third trial was harmless. The totality of the evidence and argument bearing on the drug and gun possession counts was presented in the first trial, yet the jury there could not reach a verdict on the murder charge. The evidence bearing on counts 2 through 5 was fully admissible in the first trial but nonetheless did not persuade the jury in reaching a verdict on count 1. Likewise, prior convictions evidence was presented in the second trial, and the second jury too could not reach a verdict on the murder charge. Although the prior convictions evidence was not as extensive in the second trial as it was in the third trial, it nonetheless did not persuade the jury.

Avalos suffered no prejudice by his trial counsel's failure to preserve objections to the challenged evidence because it was not reasonably probable the verdict would have been more favorable to Avalos absent any error in receiving the prior convictions evidence and testimony. Avalos argues the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, applies because the prior convictions evidence so pervaded the third trial that he was deprived of due process. We disagree. "To prove a deprivation of federal due process rights, [Avalos] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.)" If the trial court erred by receiving evidence of the facts underlying the

15

convictions on counts 2 through 5, and the other challenged evidence, the error did not render the third trial fundamentally unfair.

D.

*Evidence Code Section 352*

Avalos argues that if evidence of the facts underlying the prior convictions, evidence of marijuana growing and the drug trafficking culture, and evidence of the police searches, were admissible, all of the evidence should have been excluded under Evidence Code section 352.

Evidence Code section 352 gives the trial court broad discretion to exclude evidence if its probative value "is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 ["Under Evidence Code section 352, the trial court enjoys broad discretion"].) "Under Evidence Code section 352, the probative value of the proffered evidence must not be *substantially* outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195, italics added.)

Although Avalos's motion in limine No. 2 was made under Evidence Code section 352, the motion was directed only to "the felony *convictions*" (italics added). Even if the motion in limine could be construed as broad enough to encompass all of the evidence challenged on appeal, Avalos nonetheless failed to make section 352 objections to the evidence when it was offered at trial. By failing to make specific and contemporaneous objections, Avalos denied the trial court the opportunity to conduct an assessment under section 352, and forfeited his challenge to the evidence. (*People v. Weaver* (2001) 26 Cal.4th 876, 961; *People v. Jennings*, *supra*, 46 Cal.3d at p. 975, fn. 3.)

16

Avalos alternatively argues his counsel was ineffective for not making the appropriate objections under Evidence Code section 352. We again do not address whether counsel's representation was deficient because we conclude Avalos suffered no prejudice. (*Strickland*, *supra*, 466 U.S. at p. 697.)

Avalos argues the challenged evidence consumed an undue amount of time and confused the issues before the jury. The evidence did consume time, but our review of the record leads us to conclude the amount of time consumed was not undue. Nor do we find the evidence created substantial danger of confusing the issues or misleading the jury. It is not likely that the jury was unable to distinguish between evidence related to the charged offense—the first degree murder of Richardson—and the evidence of the facts underlying the prior convictions. The jury in the first trial made this distinction, as shown by the fact it could not reach a verdict on count 1. As we explained above, the challenged evidence was not prejudicial to Avalos, particularly when viewed against the strong evidence of guilt.

## II.

### The Trial Court in the First Trial Erred by Denying the Motion for Acquittal on Count 4.

#### A.

*Introduction and Standard of Review*

In the first trial, the jury convicted Avalos of the offense charged in count 4, violation of Health & Safety Code section 11360, subdivision (a). He was sentenced to a concurrent three-year term under count 4.

Although Avalos was charged in the language of the statute, the jury instruction and the verdict establish he was convicted on the theory he transported marijuana. At the close of the prosecution's case-in-chief in the first trial, Avalos brought a motion for acquittal on all counts pursuant to Penal Code section 1118.1.

17

Avalos argues the trial court erred by denying that motion as to count 4 because the prosecution produced no evidence he transported the marijuana found in his Chevrolet Blazer.

"On a motion for judgment of acquittal under [Penal Code] section 1118.1, the trial court applies the same standard as an appellate court reviewing the sufficiency of the evidence. The court must consider whether there is any substantial evidence of the existence of each element of the offense charged, sufficient for a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." (*People v. Harris* (2008) 43 Cal.4th 1269, 1286.) We independently review the trial court's ruling as to the sufficiency of the evidence to support a conviction. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1213.) "'Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.'" (*Ibid.*)

"When we review a claim of error in the trial court's denial of a motion for acquittal under [Penal Code] section 1118.1, 'we apply the same standard as when evaluating the sufficiency of evidence to support a conviction, except that we consider only the evidence in the record at the time the motion was made. [Citations.] We review that evidence in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. [Citation.]' [Citation.]" (*People v. Moncada* (2012) 210 Cal.App.4th 1124, 1132.)

B.

*The Evidence Was Insufficient to Show Transportation*
*of a Controlled Substance.*

1. *Definition of "Transportation"*

Health and Safety Code section 11360, subdivision (a) states: "Except as otherwise provided by this section or as authorized by law, every person who transports,

18

imports into this state, sells, furnishes, administers, or gives away, or offers to transport, import into this state, sell, furnish, administer, or give away, or attempts to import into this state or transport any marijuana shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for a period of two, three or four years."

"'Transportation of a controlled substance is established by carrying or conveying a usable quantity of a controlled substance with knowledge of its presence and illegal character.' [Citation.] 'To transport means to carry or convey from one place to another.' [Citation.] 'The crux of the crime of transporting is movement of the contraband from one place to another.' [Citation.] The term 'transports' as used in the statute is 'commonly understood and of a plain, nontechnical meaning.' [Citation.]" (*People v. LaCross* (2001) 91 Cal.App.4th 182, 185.) The length of travel need not exceed a threshold distance. (*People v. Emmal* (1998) 68 Cal.App.4th 1313, 1315-1316 [methamphetamine transported 20 feet by vehicle sufficient].)

Mere possession is not evidence of transportation: The prosecution must prove the defendant moved the contraband from one place to another. (*People v. Kilborn* (1970) 7 Cal.App.3d 998, 1002-1003 (*Kilborn*).) "[T]he requirement of volitional transport of [a controlled substance] from *one location to another* avoids any unwarranted extension of the statute to restrained minimal movement within a residence or other confined area that does not facilitate trafficking, distribution or personal use of drugs." (*People v. Ormiston* (2003) 105 Cal.App.4th 676, 684-685.)

2. *Evidence Presented During the First Trial*

The evidence presented during the prosecution's case-in-chief on count 4 established the following. After Avalos was arrested, Peters found a black Chevrolet Blazer in the garage of a home on Shadybend Drive in Moreno Valley. The Blazer was towed to a secure lot where it could be searched. Inside the Blazer, Peters found about 24

19

pounds of marijuana. During the police station interview, Avalos stated he drove the Chevrolet Blazer to and from the murder scene on February 23, 2008.

The prosecution produced no evidence the marijuana found in the Chevrolet Blazer had been transported any distance. The Attorney General argues the jury could infer that the marijuana found in the Chevrolet Blazer had been there day before, when Avalos drove it to and from the murder scene. This inference is too attenuated to be reasonable. No evidence was presented of how, when, or by whom the marijuana was placed in the Chevrolet Blazer. A significant amount of time has passed from when Avalos drove to and from the murder scene to when the Chevrolet Blazer was found parked in the garage.

A similar case is *Kilborn*, *supra*, 7 Cal.App.3d at page 1001. In *Kilborn*, restricted drugs (LSD) were found in a suitcase in the defendant's motel room. (*Ibid.*) The defendant claimed he knew nothing about the drugs or how they got into his suitcase. (*Ibid.*) The Court of Appeal reversed the defendant's subsequent conviction for transporting restricted dangerous drugs. (*Id.* at pp. 1003-1004.) The Court of Appeal reasoned: "While the evidence showed the LSD tablets were found in appellant's suitcase in his room, the prosecution presented no evidence he carried or conveyed them from any place, to any place at any time. Evidence of unlawful possession is not evidence of transportation." (*Id.* at pp. 1002-1003.) The court rejected the argument an inference of transportation could be drawn from evidence of possession. (*Id.* at p. 1003.) "The vice of the argument the pills found in appellant's possession must have been transported there in some manner, ergo, appellant transported them, is it substitutes speculation and conjecture for competent proof. Carried to its logical conclusion, the argument would permit conviction for transporting in any case where possession is proved." (*Ibid.*)

20

In this case, the only evidence supporting the charge of transporting marijuana was that marijuana was uncovered in Avalos's Chevrolet Blazer found parked in a garage. Avalos had not driven the Blazer since the previous day. As in *Kilborn*, "the prosecution presented no evidence [Avalos] carried or conveyed [the marijuana] from any place, to any place at any time." (*Kilborn*, *supra*, 7 Cal.App.3d at p. 1002.)

The Attorney General also argues the evidence supported a conviction for attempted transportation of marijuana. The argument suffers two flaws. First, Avalos was convicted of transportation of marijuana, not of attempted transportation of marijuana. Even if the evidence was sufficient to convict Avalos of attempted transportation of marijuana, the fact is the jury did not convict him of that crime.

Second, the evidence would not support a conviction for attempted transportation of marijuana. "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (Pen. Code, § 21a.) At the close of the prosecution's case-in-chief, there was not substantial evidence that Avalos engaged in a direct but ineffectual act toward commission of attempted transportation of marijuana. As explained above, no evidence was presented of when, how, or by whom the marijuana was placed in the Chevrolet Blazer.

## DISPOSITION

The judgment as to count 4 is reversed. We direct the trial court to modify the sentence by vacating the concurrent three-year sentence under count 4 and, as modified, affirm the judgment on all other counts and in all other respects. We direct the

21

trial court to prepare and forward to the Department of Corrections and Rehabilitation a new abstract of judgment reflecting the modified sentence.


                                                            FYBEL, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.